Good morning, Heather Williams and Brian Rademacher on behalf of Appellant Jason Wright. With the Court's permission, we do wish to go ahead and divide our arguments. I will be arguing the fair trial issues, and Mr. Rademacher plans to argue the interstate commerce, suppression of statements, and sentencing issues. Either of you want to reserve any time? I think that we both plan to reserve a total of about four minutes. Two apiece, roughly? That would be wonderful. Thank you. When a mystery writer writes a whodunit novel, there's a formula, and that formula means that they provide a motive, a means, and an opportunity. And in this case, we know whodunit. It was Sean Ditforth. He had the motive, he had the means, and the opportunity. And we weren't allowed to present any evidence of either the motive or the means. What was the motive? Well, first of all, it was the testimony of a young boy who said that when he was 12 to 13 years old, Sean Ditforth grabbed his bottom, made sexual advances at him, and showed him adult pornography, which could be interpreted as grooming. We had the testimony of a young woman, Holly White, who said that she saw Ditforth make sexual advances to adolescent boys when they were working together in the skate shop. We had the means. We had the means by virtue of the school records that said that Sean Ditforth not only took computer classes, but had sufficient computer knowledge to actually test out of those computer classes, that he had the knowledge and the ability to go ahead and manipulate the programs and the files on the desktop which was seized to provide the means to commit the crime. And now we were able to go ahead and present that he had the opportunity. That period of three days when Jason Wright was out of town, out of Tucson, in Las Vegas at a convention, where Sean Ditforth, his roommate, was alone in the apartment, and we provided evidence from our forensic analyst to show the activity that happened on the computer during those three days that Sean Ditforth was alone in the apartment. So we know that he had the motive, the means, and the opportunity. We tried to get that evidence in under 404B. Now, 404B is one of the section of relevance rules of evidence. It is an evidentiary rule of inclusion, not of exclusion. And it is not a rule of impeachment, because those are under the 600 series of the rules of evidence. And if there were any concerns about this relevant evidence concerning Sean Ditforth, the Court could have given some kind of a limiting instruction. But instead, the Court, as a matter of law, concluded that the 404B evidence, while relevant, certainly if Sean Ditforth testified, was not relevant unless he testified. And we were precluded from presenting any of that evidence at trial. When you said any of that evidence, you presented the opportunity evidence? We did present the opportunity evidence, yes, sir, but not the motive nor the means. And that he was a roommate, lived there, et cetera. Absolutely. Had his access to the laptop computer, to the mainframe, et cetera. That's true. We were able to present all that. What did you do to preserve this objection when the government objected and you wished to offer this evidence?  What was done? There was, Your Honor. First of all, with regard to the school records, we had actually filed our notice ahead of trial by about two years of our notice to present those school records. When we had the hearing on those in January of 2007, the government indicated at that time that it would be calling Sean Ditforth as a witness. We said that the relevancy of the computer information showed knowledge, opportunity, motive, and identity. By time we got to just before trial is when we had discovered this other information that goes to the motive, that is the testimony of the boy as well as the co-worker in the shop. We had provided through disclosure copies of the statements that our investigator did, and it was a basis for our motion to continue just before trial that we needed to get some additional time to actually locate these witnesses and to fully litigate the fact that we wanted to get into that. Now, when it comes to the offer of proof, we had found the witnesses by time we did opening statements, and in an opening statement I provided what I suspected their testimony would be. We say that that equates to our offer of proof. It was after the opening statements that the government then went ahead and objected, and the basis that they objected was not the late disclosure. It was based on the Court's previous ruling regarding the 404b evidence and its ruling that unless Sean Ditford testified, nothing regarding Sean Ditford under these categories was going to come in. That's when I reviewed the Court's order and realized that I suspected that even though we had not actually litigated the prior the testimony of the young boy and the woman, that it would be precluded under the same basis and withdrew it. Kennedy. Do I misunderstand, counsel, that at that point, though, the Court expressed some skepticism about whether the evidence would come in, suggested that you bring additional legal authority that would permit the Court to introduce the evidence, but that was never forthcoming? Do I misunderstand the record? My understanding of what the Court had actually said was that, yes, it was precluded at that time, but if I could find another basis or raised another basis to try and get it in, then he would reconsider that. But you never brought anything else back, right? I did not. So under the circumstances, can you argue that the Court actually precluded it? Yes. On what basis? On the fact that he didn't, that he precluded it and upheld the government's motion after opening statements. I thought that maybe I misunderstood. You were obviously there. But I don't remember seeing anything in the record where the Court actually ruled to preclude it. It simply said, I'm inclined, but if you have some evidence, you bring it in, I'll take a look at it. Do I misunderstand? And I think that you are remembering correctly. And we interpreted that after, especially after reviewing the Court's previous order, that it would have been included under the prohibition unless Mr. Diffworth honestly testified. We did not prove it. There's no express language, if we parse the record, there's no express language where the Court said, I am not going to permit this. Not during the trial, no, sir. Okay. I would like to go ahead and shift gears, unless you have something else on this, and talk a little bit about prosecutorial misconduct before I hand things over to Mr. Rademacher. And that is, with regard to the prosecutorial misconduct, the Court, at least on one level, said, no, keep your comments to yourself. And the prosecutor either couldn't or he wouldn't do that. The Court, the government in its responses to our briefs conceded that most of the statements we brought forth were indeed misconduct. They argued that a few of them were actually permitted, such as the sarcastic statements, but otherwise didn't say anything one way or the other basically conceding that misconduct had occurred. And their argument instead is that it either didn't equal error or it was not plain error. Where's the prejudice? The prejudice is individual in some of the statements and the more egregious ones, especially the ones that happened during the closing statement. For instance, the trifecta argument here, where the government not only didn't they didn't couch it in terms of their opinion, they actually couched it in terms of their experience. I've tried a number of these kinds of cases and based upon this experience, that is the most egregious kind of vouching. It's not just opinion, but based on me, the government lawyer, having tried so many of these cases. You make, if I may say so, an excellent rebuttal argument to that, though, to the jury. Didn't you just hammer that right off the bat and tell how out of line it was? I thought so. Apparently the jury didn't totally agree with me, which I think as a defense lawyer, we know, especially in this kind of case, that the minute the jury hears the indictment and the charge, we have a tough road to hoe. And the government, especially the government's lawyer in this case, he's a handsome young man, he's very well spoken, and he's very personable. And to combine those two facets with now coming in and saying, based upon my experience having tried a number of these cases, it almost puts him on the white horse as a knight. But yet at the same time, he was found not guilty or client of the CD possessions, which was your argument was deal worse. They obviously bought that. Yeah, and they bought that. And that's... That just seems to be slighted somewhat. Or it is heightened, because this was a very close case. Obviously the jury was out for a couple of days, and they did acquit on eight of the ten counts. And so this kind of cumulative misconduct in front of the jury, having been allowed to proceed and without any kind of curative instructions other than the generalized ones, what attorneys say is not evidence, just could have been enough to actually tip the scales to acquittal on the remaining two counts. So I think that's the answer. Because we ask questions, we'll give you a full two minutes. But if you want to save rebuttal time, we should probably now hear from Mr. Rademacher. I'd like to do that. Thank you. Okay. Thank you. Good morning. I'd like to make some, maybe five brief points about the interstate commerce jurisdictional element. First, no court has ever upheld a conviction for transporting child pornography images in interstate commerce under the unique facts of rights case. As the government conceded and the district court found, the government's experts established conclusively that none of the images on rights computer crossed state lines, that they were wholly intrastate. As a matter of fact, the evidence was conclusive that they went from rights computer in Tucson in a direct client communication to the FBI computer in Tucson through the Cox cable in Tucson. Second. As you know, there is that McGowan-McEwen Third Circuit case, which basically suggests that when you put something on the Internet, that's all you need. And there are obviously cases to the contrary. What's your rebuttal to McEwen? Several. First, McEwen is based on the unique facts in that case, which are wholly different here. In that case, the government could not prove the path that the images took on the Internet. And so what they did instead was they brought in an expert who said, there's a And there was nothing to rebut that. In this case, the government actually proved the opposite, that nothing ever crossed state lines. So they proved the complete opposite of what was missing in McEwen. Do you think McEwen then is wrongly decided in your view now? Well. You're arguing here. I think the Court does not need to resolve the conflict because of the unique facts here. Your experts and the government experts clearly said what you said they said. I wonder how that comports with the Lewis case in the First Circuit. In Lewis, which you cited in support, and I'm going to quote it, it said, Although the Supreme Court has defined peer-to-peer networks as those in which users' computers communicate directly with each other, not through central services. In this context, such a description may be misleading. A central server is not needed to coordinate the file transfer. The transfer is still subject to dynamic routing associated with the underlying TCP-IV protocol. That means the direct connection is mediated by whatever steps each of the packets might take. And the evidence here is completely the opposite. In those cases, it was still possible, using the direct communication that was going over the Internet, that it was likely to have crossed state lines. The experts in this case said, given the direct client communication between Wright's computer in Tucson and the FBI's computer in Tucson, and the way it was set up, it went only over Cox's Cable in Tucson. So in those cases, there was still the likelihood that it actually crossed state lines. Here, the government conclusively established it not only did it not cross state lines, but given the setup, it could not have crossed state lines. But, counsel, does the fact that the Congress amended this portion of the law have any bearing on how we should construe this statute? Well, I think that it shows that Congress realized that the jurisdictional element in this case at the time of the offense was insufficient to capture the use of facilities. That does not appear in the statute at all. And I think the Court has to at least look at the fact that Congress said it was a clarification. But all that exists — As opposed to a statement of what they originally intended. Right. The 2008 Congress said this is a clarification. It's what we originally intended. It's the — And they suggested all you got to do is, you know, use any facilities in the Internet, and you got it. Correct. And they changed the law. They did a major rewrite of this statute to say that now it includes anything that affects commerce and includes the use of any facility. Also, in comparison to what — What I'm looking for help on this, the Supreme Court said that Lilly Ledbetter doesn't get any relief. Congress said, no, no, you misunderstood. This is what we really meant. This is the way it is. It seems like this is something of a correlation. Should that have any bearing on our construction of the law as it existed at the time of this offense? The Court should look at what Congress said about that. But the only thing that supports Congress's statement, and this Court, I think, should do the analysis to see whether that statement was correct, there was no analysis by Congress that appears in the legislative history on this. It was just a bare statement that this was a clarification, and it's what a Congress 30 years before. The courts have consistently said it's dangerous to use this subsequent legislation. But if we look back to what Congress intended in 1977, the legislative history shows quite clearly, and this Court in the McCoy case said, that Congress did not want to reach local intrastate conduct. And it specifically rejected one of the very hooks that the 2008 Congress put in. Originally, as it was offered, they wanted to put in the word effects. The Department of Justice said, we don't think you should do that. And I think at the time they were concerned that it might be unconstitutional. I can say, does the fact that this is a criminal statute make any difference in terms of construction? Well, I think that at best for the government, it's ambiguous. I think it's not ambiguous because I think the plain language does not include the word facility. Congress knew how to put that into statutes. There are statutes existing. As a matter of fact, the Travel Act that exists in the Nader case, that I think came into existence in 1961, and it used both terms. It said, in interstate commerce or if you use a facility. So Congress knows how to use those terms and it knows what those terms meant, and it said so in 1977. So another thing that I'd like to point out is that there's also evidence in 1998 that Congress, that was the first time Congress ever expressed a concern that the Internet was being used by predators in child exploitation crimes. And so back in 77, they could not have been worried about the Internet as a facility because nobody knew about the Internet at the time. Mr. Gore did. I don't think he'd invented the Internet at that time. I think it was at a later time. Okay. But clearly Congress, its first expression that the Internet was a concern in committing and furthering child exploitation crimes was in 1998. In legislative history, Congress says that those, that the jurisdictional hook in those statute about transporting in interstate commerce did not capture the use of a facility like the Internet. They actually passed a couple crimes that said, you know, because predators are using the Internet to commit their crimes, we're going to pass a couple crimes. And most important, they also looked at the kidnapping statute, 18 U.S.C. 1201, which has the very same jurisdictional element here, to transport in interstate commerce. They're a victim. Congress quite explicitly said in the history that that term does not include cases where the Internet was used as a facility to further the crime. They actually referred to a New Jersey case in which a victim was kidnapped. The FBI investigated and found out eventually that the victim wasn't transported across State lines, but the Internet was used in that case. And Congress said in the legislative history in 1998 that that did not include the use of the Internet or a facility. Congress thought about it then, but they didn't change the jurisdictional hook on the kidnapping until 2006. But Congress made it pretty clear in 1998 that they considered that an expansion of the jurisdictional hook. And when they passed it in 2006, they didn't call it a clarification. So, yes, the Court should take a look at what Congress said, but all the evidence is to the contrary. Let me mention to you that you've now a little bit past your time. Do you want to save a few minutes? I will save time for rebuttal, unless the Court has questions right now. Why don't we do that in rebuttal? Thank you. Okay. Mr. Ferg, are you the good-looking, handsome fellow that Ms. Williams made reference to? No, I'm not. I wish I was that young and good-looking, but it was another gentleman who was actually trying the case. Okay. Bruce Ferg, Assistant United States Attorney on behalf of the government in this case. Since we're kind of into the interstate commerce issue, I'll go to that one first. I think what the Court needs to recognize is that the actual language of the statute actually is written rather broadly, which is that it forbids knowingly mails or transports or ships in interstate or foreign commerce by any means, including by computer. So it's important to recognize, as McKeown Court did, that it doesn't address the actual transmission of pornographic images. And what the defense is attempting to do in this case is basically carve up what is in fact the unitary transaction into pieces. Counsel, if the government is correct on that, why then, first of all, the government conceded that it didn't go on interstate commerce, right? You agree with that? It conceded that the images. That's what we're talking about here, right? Yes. The images didn't go on interstate commerce. Why did the Congress even bother to amend the statute if that was so clear? Because the Tenth Circuit had created a conflict amongst the circuits. Previously, the first. It wasn't so clear. Pardon me? It wasn't very clear then. Which is exactly why it was a necessary clarification rather than a change. That's what this Court talked about in the Belshi case. How do you determine that a statutory amendment is clarifying rather than substantively changing? The government bears the burden on this, does it not? This is a jurisdictional hook, if you will, without which you don't succeed on this particular point, right? Yes, sir. Okay. But under the circumstances, let's just take your point. If it's ambiguous, Congress must have thought it was or wouldn't have changed it. The government bears the burden, otherwise you lose on this point, and the government concedes it didn't go on interstate commerce. How does the government win on that? Because what I was trying to explain again is that we're talking about a unitary transaction, which nothing, no images would have been transported anywhere except for three separate instances of interstate computer traffic. First of all, the defendant hooked up to the IRC network, Undernet, which is basically like posting an ad in USA Today. It goes across the entire country. There's testimony that there were 115,000 users at the time that the FBI agent went onto that Internet. So first of all, he's connecting himself, offering himself on the Internet. Secondly... Isn't that a different account, though? We're talking about the transmission of these photographs, right, or images. We're talking about the conduct which supports this particular element. Yes, the advertising account he was acquitted on, but that's something else again. But that's the point you're making now, though, is that he advertised throughout the Internet. By means of... I'm focusing right now on the images. As I understand it, the government conceded that the images did not travel interstate. Do I understand correctly? That's correct. Under the circumstances, the statute refers to the interstate... I can't get the exact language. Any person who knowingly mails or transports... I'm skipping part of it. Or ships in interstate or foreign commerce by any means, including a computer, so on and so on. How then did the government prove that the defendant, Mr. Wright, transported or shipped in interstate commerce? Because the transaction as a whole could only have occurred because of the initial interstate activity. You mean because of the advertising? Not only that. That was just the first one. That, of course, went across the entire country. Secondly, the FBI agent, when she actually did her sessions, had to go back interstate. And there was specific testimony that her message back to the defendant actually crossed state lines because it was clear from the computer records that it had gone through a server in San Jose. Again, no disrespect intended, counsel. 2252AA1 talks about the defendant, in this case, transported or shipped in interstate commerce child pornography. Those other things you talk about are, if you will, they help set the stage. They talk about what was going to happen. But the actual transport in this case, Hasn't the government simply conceded that it didn't meet that requirement, unless you follow the McCaw case? I respectfully suggest not. Because, once again, what the defense wants to do is to carve this up into little pieces rather than look at what the real transaction as a whole was. And the fact is that no images would have gone anywhere except for those initial interstate communications. Isn't this analogous to the case the defendants raised in the telephone threats in the circuit where there were threats communicated by telephone, and the first eventually contact over the state to make it an interstate communication did not contain a threat. Other ones within the state did. And that was considered insufficient. What happened here was the first communication was interstate to open up the access to this material. And then a response he gave was interstate. But the actual transmission of the photographs, based upon your own experts, was intrastate. And if I read the Lewis case, which is the more recent one out of the First Circuit, Lewis says they conclude that 2252A2 does require the government to approve actual interstate transporter shipment of the images. And there they say they approved it because they brought in evidence that the peer-to-peer use there actually could have involved going interstate, and that they gave the benefit of the doubt to the government. In essence, they weren't sure. Here we've got a record where the government conceded and proved that the images, the actual images were shipped interstate. But the argument is, of course, you had to use interstate to make the process work. But does that comport with the statute as it originally existed before the amendments? That's a concern. Two responses. First of all, I'm not sure that Lewis actually limited it that way because, as I pointed out, I think in my supplemental answering brief, Lewis actually says we're going to uphold his conviction, even though the jury instructions would have allowed the conviction without proof of actual transportation across state line of the images because they were basically buying into the theory that simply the use of the interstate, the Internet as a whole, was sufficient. Now, Brian, Mr. Rademacher, pointed out, Congress knows how to distinguish and how to use these terms. And that's why I pointed out in my supplemental brief that what do you do? You compare this statute, which does not refer to specifically getting the images across state lines, with the other statute, 2251A, which specifically says actually transported. And so the doctrine from the Supreme Court is Congress knows how to draw these distinctions, and when they do, particularly in these very closely related statutory contexts, that has meaning. But doesn't that hurt your case in this situation? I suggest not, because if Congress really wanted to limit it in the way that the defense says that the statute does, then it would have used the same language here that it did in 2251A, which was actually transports. And it didn't say that. And that's why it's important, again, to look at exactly what happened with Schaeffer. Schaeffer sets up a conflict between circuits because there were three other circuits who had already accepted the idea that simply using the Internet as a whole was sufficient to support a conviction under this statute. Schaeffer comes along and says, oh, no, you can't do that. What is Congress' response? They specifically said, Schaeffer, the Tenth Circuit got it wrong. We are clarifying. And that's not only in the individual comments by the Congressman, but it's also in the Senate report. It's always clarified, which this Court has said is not the same as change, as going back and making clear what the original intent was, which is what those various Congressmen actually said was happening. And they flat out said, we're going to make it so clear that even the Tenth Circuit can understand. And they said, this is a man who, through a judicial loophole, who was guilty under their understanding of what the preexisting statute was, got off. And we don't want that to happen again. So belt and suspenders, yes. But that's what happens when a court messes up. Congress comes along and clarifies it. Let me ask you this, counsel. United States v. Corab, which I think is the one that my colleague on the right here was referring to on our court, was this threat and telephone threats. And when they had one, the one that was recorded, I gather, that was intrastate, the court found that that was not sufficient. Judge Hogan raised the issue that doesn't that really undermine your position? Because we have something slightly different context here. But nonetheless, the same statute in terms of jurisdiction. That's why it's so critically important to look at the individual statute and its history. Because as the Supreme Court made the point in circuit cities and American building maintenance before that, even these kind of technical terms of art don't always mean the same thing in every statute. And so also from this court is Nader, where you flat out said, you know, interstate commerce doesn't mean that you actually had to go across state lines. And so it has to be in the context. And what we have here is where Congress is repeatedly saying, we want to basically exterminate the child pornography trade. And that includes anything that goes by computer. They amended the statute to do that. Then when the Tenth Circuit got it wrong, they came back and said, we're going to clarify that this is what happened so that even the Tenth Circuit can get it right. Now they put in the preferred language to make it very, very obvious to even the Tenth Circuit that this is what they intended in the first place. They've always spoken highly of you. So that's why we have to look exactly at what the particular statute is, the particular languages, the context. For example, I point out the statute in the clarifying statute. You find the reference to the Tenth Circuit got it wrong. That was I gave quite a bit of. I'm not talking about history. I'm talking about the statute. Is there anything in the statute where they said those darn people out there in the Tenth Circuit, they just don't get it. This is what we really meant. Well, that's what they said by saying this is a clarification. And the Senate report said that this was a purpose. And again, the Supreme Court has said when we talk about clarifying. We're not supposed to pay any attention to legislative history because nobody knows who's speaking. What do you think about that? When it actually gets into the language of the statute where it calls it clarifying, that is significant because that's the cumulative import of what Congress as a whole means. But it's also consistent with all the statements on the floor that I've quoted to you. I'm not sure where I am about as far as my time. You've got seven minutes and 37 seconds. I guess the last thing that I would point out, well, two points more on the interstate commerce. First of all, although this Court has not directly addressed this particular issue, your decision in Moorbacher certainly points in the direction that the government's position in this case is the correct one, because there the Court said that when somebody posts something on a bulletin board in this fashion, makes it available across interstate lines, then that is sufficient to support a conviction for transporting, which is exactly what happened here. Now, obviously, that was in the course of discussion, but it was supporting their basic understanding of how the statute ought to be interpreted. And so that certainly suggests that the theory that the government was arguing was appropriate. And, again, I pointed out, I think, a footnote to my supplemental answering brief. There's a suggestion that somehow the instructions or the government's argument did not support this theory, that it's a change in theory. That's not correct. There are about four pages of argument where the government says to the jury, this is what we mean. All it says is it had to be involved in interstate commerce. And that's what happened. The transaction as a whole, including the initial placing it on the Internet, the crossing of the agent's message, and then the third point that I haven't mentioned before is there's also testimony that how does that connection actually get made? There has to be an interstate response from the defendant's computer, from his file server to the agent. So we have three legs which are all required to be in interstate commerce before any DCC, any direct client connection can be made and images transported. So you simply cannot carve up the transaction as a whole and say, well, because this little piece of it didn't go across, it doesn't. But the statute doesn't talk about legs. It talks about transports or ships and interstate commerce. And the transaction as a whole was transportation. Transaction as a whole. It just talks about you transport it. That's a one way deal, isn't it? Where is it? Where is this? Where's the other leg in the statute? Well, I would suggest that that's kind of the situation the Supreme Court dealt with in that Schneidwin versus A&R pipeline case that I offered in a brief. There they were looking at a situation where the company only did intrastate storage of gas or oil, whatever it was. And they said this is still interstate commerce because that is an integral part of the whole transaction of getting it from here to there. And so they said, yes, FERC has jurisdiction over this because it's interstate commerce. And that's essentially what's happening here. The ultimate transportation of the images could not have taken place but for these prior three steps in interstate commerce. What about the concession of the government that that didn't happen, that there was no interstate commerce involved? It did not concede that. It conceded that the particular images, according to the testimony, would only have gone intrastate. Was there testimony about the other legs that you made reference to? Yes, sir. It's all in the briefs. And just to highlight the last part about the necessity for the defendant's file server to communicate back in response to the request and establish the DCC link, it's testimony from Sven Nielsen, the government's expert, which is at supplemental excerpts of record volume one, particularly pages 177, 78. And then there's kind of a broader explanation of the whole concept in that same volume at 163 to 166. So he was making very clear that even at that stage where the agent has tapped in, if you will, into the file server, still there cannot be anything that happens until the defendant's computer says, in effect, yes, I'm going to connect with you by direct connection. So nothing could have happened except for those interstate steps. Now, briefly getting back to the whole fair trial issue as far as the difference evidence, basically, as I laid out, I think, in quite a bit of detail, there was no sufficient objection to the evidence of which was actually improper propensity evidence coming in. It was raised several times. And Judge Collins said, well, I'm not sure how I can come in if he doesn't testify. But you, Ms. Williams, come back to me with some other basis or further support for your position that it can come in. And she didn't. And so as the cases I laid out in the supplemental brief say, it's not enough just to kind of throw something up in the air. There's got to be a definitive ruling by the district court in order to preserve that issue. Is that the prong of this particular complaint by the defense that you're relying upon, is that the court never actually ordered that the testimony not be admitted? It is, to the extent that it establishes the standard of review, which is plain error rather than the full-fledged review. And again, I want to emphasize what I laid out in the brief. Yes, there are certain purposes for which you can bring in, even against a non-defendant and non-testifying witness, 404B kinds of evidence. But the very case that the defense was relying on makes clear that you do this only to the limited extent that you don't cross the other requirements, which are you don't get into propensity evidence. And that's essentially what they're trying to say. You can dress it up and say circumstances and opportunity and everything else, but they're basically saying he kind of liked little boys, so obviously he had to be the one who actually did this. Bottom line, it didn't exculpate the defendant, and that's the only thing that would have made any difference, because at best it showed that both of them had access. It did not exclude the defendant. It's particularly worth noting, I think, and this is pointed out in a defense exhibit, Exhibit 515, which is included in Volume 2 of their excerpts, pages 260 to 209, that none of the charged images, none of the charged files in the accounts on which the defendant was actually convicted were among those that supposedly were dealt with or handled during his alibi period when he was in Las Vegas. If you actually look at the times, there weren't any between the 20th and the 22nd of January. So the actual images and files on which he was convicted, none of them were alibied for. Mr. Ferg, we thank you very much for your presentation. And we'll now hear from Ms. Williams for two minutes of rebuttal. Mr. Ferg is the other good-looking government lawyer. But he doesn't like the Tenth Circuit, though. I want you to know. I gathered. I just wanted to go ahead and clarify that before trial on the 404B, there was a conclusive ruling by the Court that certainly the school records would not come in unless Mr. Ditford testified, that we dismissed the witnesses after we had made our opening statement and after the government had raised an objection based on the Court's earlier ruling, that that information, as well as any other information regarding Mr. Ditford, shouldn't come in unless the witness testified. You all did not call Dilworth? We did not call Mr. Ditford. The initial conclusive ruling was that the evidence would not come in unless Mr. Ditford testified. At the time of trial, after opening statements, the Court said unless we could give another reason why the evidence should come in. Well, the reason we gave was that the evidence would not come in unless Mr. Ditford testified. The reason we gave was 404B, and the Court had already conclusively ruled based on 404B. We felt that the opportunity information ---- Wouldn't that have been an indication by the Court that you had to do something more than 404B? And what other information is there? There is no other basis that we could get it in if Mr. Ditford didn't testify because we felt it was not impeachment. It was information that we were allowed to get in under McCourt and Crosby, that when we are saying a third party committed the crime, that person doesn't have to testify. And so it does come in under 404B for the reasons we stated, to show motive, to show opportunity, to show identity and so on like that. As I said before, this was a very close case. And the information that we provided regarding fair trial, if the rulings had been correctly done below, would have tipped towards acquittal on the remaining two counts. Aren't there other reasons why hearsay can be admitted? Absolutely. If there are statements against interest, if there's some other ---- we proposed the school records would come in under a business records exception, but that was also conclusively denied. Unless Mr. Ditford testified. Thank you. Very good. Thank you, Ms. Williams. Mr. Rademacher. Thank you. I would first like to start with the fact that the law, including this Court's case in Teralo and the Supreme Court case in McCormick, states that this Court could not affirm on any other basis that the jury was not instructed on. In this case, the jury instruction required for conviction that, I quote, the transportation must involve movement of the materials in question across State lines. Mr. Rademacher, I wonder if I could direct your attention to Mr. Ferg's comments about the amending statute. He indicates that the amendment indicated a clarification. Do you agree with that? I agree that the word clarification exists and that Congress stated that, yes. Okay. Now, if that's the case, doesn't that relate back to inform us what Congress intended respecting this statute? The Court should consider that statement, but the cases say that it's this Court's duty to determine whether its statement that it was a clarification is correct. And we've gone through all the reasons why it is not correct. The only thing that points in that direction, essentially, is the Congress's statement that it is a clarification. All the evidence, looking back from 1977 all along the way, shows quite conclusively that Congress did not want to reach the local conduct, that Congress rejected the broader jurisdictional elements such as effect, and that it only adopted it in 2008. It's okay for Congress to be upset that the Schaefer case overturned someone's conviction on insufficient proof. And so Congress's reaction is to say, our statute doesn't cover that. We need to change it. But for them to say that 30 years before, without thinking this through, when the Internet didn't exist, when Congress didn't use the word facility, but it could have and it had in other statutes, that the statute was clear. All the courts, every circuit across time, have always held that this jurisdictional hook, transports or ships or moves or transmits in interstate commerce, always requires, they've equated it with movement in interstate commerce and has required proof that shows across state lines. Kennedy. Based upon your approach, Mr. Rademacher, is there anything that the Congress could have said to reach the result that Mr. Berg indicates is what they intended? I think not, because once Congress looked at what the reality was, what Congress actually intended, they would see that Congress said, we don't want to reach localized conduct. They said that in 1977. Department of Justice urged that. Don't put a broader term. And in 2008, Congress did the exact opposite. They said, we want to have the broadest reach possible. That's directly opposite to what Congress said in 77. In 2008, it said, let's put in the hooks effects and facilities. Congress rejected the effects one clearly. And in between, the Congress has stated that the term in interstate, to transport in interstate commerce, does not include facilities, which is the argument. But I would just point out. Any other questions by my colleagues? If not, we thank all of counsel. Very good arguments in this case. We thank you for that. The case of U.S. v. Wright is submitted. And the Court stands in recess for the day. All rise.
judges: Hogan, Hug, Smith M.